UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FORD MOTOR COMPANY,

    Plaintiff,

-vs-

FREDERICK G. WILLIS,

    Defendant.

_____/

Case No. 07-13154
Judge Avern Cohn

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This is a contract case. Defendant Frederick G. Willis ("Willis") is a former employee of Plaintiff Ford Motor Company ("Ford"). During his employment, Ford sent Willis to work in Germany as an "International Service Employee" ("ISE"). Under applicable employment policies, Ford reimburses its ISEs for any foreign tax liability they incur beyond the tax they would have had to pay had they been working in the United States. By the same token, ISEs are required to remit to Ford any foreign tax refunds or credits they may receive. Ford says that Willis failed to remit several such refunds or credits and raises claims for breach of contract and unjust enrichment.

Before the Court is Willis's motion for summary judgment on grounds that the action is barred by the statute of limitations. For the reasons that follow, Willis's motion will be denied.

## II. Facts

Willis began working for Ford in 1976 as an engineer. Ford assigned Willis to work as an ISE in Germany from April 1994 to November 1996. After returning to the United States, Willis continued with Ford and worked in Michigan until resigning in December 1999. Willis is currently retired and resides in Florida.

Pursuant to policies expressed in its "International Service Guide,"[1] Ford attempts to ensure that ISEs do not suffer any tax consequences, positive or negative, as a result of working outside the United States. Accordingly, Ford reimburses its ISEs for any tax liability they incur beyond the taxes they would have paid if they had remained in the United States. ISEs may either may request either "tax reimbursements" after their foreign taxes are paid or "tax advances" when foreign tax payments are due before a final reimbursement can be made. Reimbursements and advances may be paid to the ISE or directly to the foreign taxing authority depending on the circumstances.

On the other hand, ISEs are required to remit to Ford any refunds or credits they receive from foreign taxing authorities as a result of taxes that were actually paid by

---

[1] Willis objects to Ford's reliance on what Ford claims is its 1994 International Service Guide, noting that the document itself is not dated and no witness has authenticated the document in a supporting affidavit. Ford included its 1999 "International Service Practices" with its complaint. This document is dated and is very similar or identical in all relevant respects to the purported 1994 Guide.

2

Ford. In addition, ISEs must reimburse Ford for any foreign tax credits they receive from the United States as a result of foreign taxes actually paid by Ford. The International Service Guide provides that foreign tax credits should be remitted to Ford even if they are utilized after the ISE's international service has ended:

> The Company's practice regarding foreign tax credits includes a review and tracking of any foreign tax credits carried back or forward. This includes a review and tracking of any foreign tax credits you may use after you have completed your international assignment for a period of up to five years, and any tax gross-down resulting from any repayment you make to the Company.

When Ford determines that a tax repayment from a current or former ISE is due, Ford (or its agent) prepares a final "Tax Equalization Statement" and sends it to the ISE. The Statement shows the amount of money owing to Ford and contains instructions for repayment.

While Willis worked as an ISE, his paychecks included deductions and corresponding credits to his income for German income taxes. The paychecks also included deductions for Willis's estimated, hypothetical United States income tax. During this time, Ford sent Willis tax advances on a monthly basis.

Throughout his time at Ford, Willis's tax returns were prepared by Ford's agent, PricewaterhouseCoopers LLP ("PWC"). PWC would make the estimates of Willis's hypothetical United States income tax liability and decide whether and how to utilize any applicable tax credits. PWC would send the returns to Willis for his signature and then file the returns on his behalf.

Ford alleges that Willis claimed foreign tax credits on his United States income tax returns between 1995 and 1998 and in 2001 based on the German income tax

payments that were actually made by Ford. Ford proffers Willis's 2001 income tax return, in which he claimed a foreign income tax credit of $80,713.[2]

Ford also alleges that Willis's estimated income was understated for several years due to the payment of bonuses and the exercise of stock options;[3] as a result, Willis's estimated hypothetical United States income tax liability was also understated, and the tax reimbursements that Ford paid to Willis were too large.

Ford sent Tax Equalization Statements to Willis on September 19, 2001, and November 5, 2002, summarizing liabilities that Ford claims Willis incurred as a result of the ISE program. In the latter statement, Willis's claimed debt to Ford was reduced from $267,095 to $196,722. The reduction in Willis's debt resulted from a federal income tax reimbursement owing on Willis's 2001 income tax return that was paid to Ford. The 2002 statement is marked "final," while the 2001 statement is not.

In 2001, Ford generated a W-2 Wage Statement in Willis's name in the amount of $380,492. Ford says that this sum represented excess tax reimbursements paid to Willis as a result of his estimated income being understated, as well as foreign tax credits that Willis utilized on his United States income tax returns between 1995 and 1998. The same figure of $380,492 appears in the September 19, 2001 Tax Equalization Statement that Ford sent to Willis. Ford paid all state and Social Security taxes associated with the 2001 W-2.

---

[2] Because he no longer worked for Ford, Willis's 2001 income tax return was prepared by his personal accountant, not PWC.

[3] Ford says that Willis exercised stock options attributable to his service in Germany in 1997 and 1998.

4

In 2002, Ford generated another W-2 for Willis in the amount of $123,346. Ford says that this sum represented excess tax reimbursements paid on the income represented on the 2001 W-2. The same figure of $123,346 appears in the Tax Equalization Statement that Ford sent to Willis on November 5, 2002. Ford paid all taxes attributable to the 2002 W-2. Ford says that the 2002 W-2 represented Ford's last payment of taxes on behalf of Willis, and that Willis's liability to Ford therefore did not become final until 2002.

In 2006, at Willis's request, PWC prepared a "cash flow analysis" of Willis's tax equalization payments for the years between 1995 and 1998 as well as 2001. The cash flow analysis reflects foreign tax advances made on Willis's behalf in 1995 and 1996. The parties agree that Willis's foreign tax withholdings ended after 1997, but Ford says that it continued to pay state and foreign taxes on Willis's behalf until 2001 and that Willis continued to utilize foreign tax credits stemming from foreign taxes paid by Ford until 2001.

Ford says that, in total, Willis owes $196,722, representing both excess tax reimbursements paid to Willis by Ford and foreign tax credits claimed by Willis between 1995 and 2001.

### III. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

### IV. Discussion

The parties agree that Ford's causes of action for both contract and unjust enrichment are subject to a six year statute of limitations. MCL §§ 600.5807(8), 600.5813. This action was filed on June 27, 2007. The only issue before the Court, therefore, is whether the statute began to run before or after June 27, 2001. The Court may grant Willis's motion only if there is no genuine issue as to facts dictating that the statute began to run prior to that date.

As an initial point, Willis's contention that the International Service Guide required Ford to finalize Willis's debt by 1997 is erroneous. Willis relies on a provision in the Guide stating that "[f]inal tax reimbursement claims must be made annually or as soon as the final tax returns are completed and final tax payments made."[4] However, this provision applies to tax reimbursement claims that ISEs submit to Ford, not the tax reimbursements that Ford pays to ISEs. Moreover, other provisions in the International Service Guidelines make clear that an ISE's liability to Ford may not become final until sometime after the ISE's foreign service is complete. For example, the 1999 Guide provides that Ford may "track[] foreign tax credits you may use after you have completed your international assignment for a period of up to five years." Willis's argument that the International Service Guide required Ford to finalize Willis's debt immediately after Willis ended his foreign assignment is therefore unavailing. There is

---

[4] An identical provision is part of both the purported 1994 Guide and the 1999 Guide.

no provision in the International Service Guide that alters the ordinary application of the statute of limitations. Accordingly, the date that Ford's cause of action accrued and the statute began to run will be determined according to the Michigan statute and applicable precedent.

Under Michigan law, "a cause of action for breach of contract accrues when a contracting party fails to do what he is obligated to do under the contract." Jacobs v. Detroit Automobile Inter-Ins. Exch., 107 Mich. App. 424, 431 (1981). That is, "[a] breach of contract claim accrues on the date of the breach, not the date the breach is discovered." Mich. Millers Mut. Ins. Co. v. West Detroit Bldg. Co., Inc., 196 Mich. App. 367, 372 n.1 (1992). In this case, Ford contends that Willis breached the contract when he refused to make the payments demanded in the Tax Equalization Statement of November 5, 2002. Willis argues that Ford was required to finalize Willis's debt at an earlier date and that Ford's cause of action accrued at that time.

Although the parties agree that Willis ceased working in Germany in November 1996, Ford has presented evidence tending to suggest that the tax consequences associated with Willis's work in Germany continued until the filing of Willis's 2001 federal income tax return. In his 2001 return, Willis claimed a foreign tax credit of more than $80,000. Willis does not deny that he claimed the foreign tax credit on his 2001 return or that the credit resulted from the German income taxes paid by Ford. Willis filed his 2001 income tax return in 2002, within the six-year period specified by the statute of limitations.

The Ford International Service Guide specifically provides that Ford may continue to monitor the utilization of tax credits by an ISE for up to five years after the

8

ISE concludes his/her foreign service. On this point, the Guide is in keeping with the provisions of the Internal Revenue Code in force at the time, which allowed for excess foreign tax credits to be carried forward up to five years. 26 U.S.C. § 904(c) (2002).[5] Thus it is not true, as Willis contends, that the International Service Guide gives Ford unfettered discretion to determine when its cause of action accrues. Ford must finalize its tax equalization with an ISE when the tax consequences of that ISEs foreign employment become final. Owing to the five-year carry forward provision of the foreign tax credit and Willis's election to claim a foreign tax credit on his 2001 return, the tax consequences of Willis's service did not become final until 2002.

Ford needed to monitor Willis's election of the foreign tax credit in the years following the conclusion of his foreign employment in order to prepare a final Tax Equalization Statement. It is undisputed that Willis carried forward his excess foreign tax credit to his 2001 return, and that Willis filed his 2001 return less than six years prior to the commencement of this action. Accordingly, the action is timely, and Willis's motion for summary judgment is DENIED.

    SO ORDERED.

Dated: October 2, 2007                s/Avern Cohn
                                             AVERN COHN
                                             UNITED STATES DISTRICT JUDGE

---

[5] Section 904(c) was subsequently by the American Jobs Creation Act of 2004 to allow taxpayers to carry forward excess foreign tax credits for up to ten years, effective for tax years ending after the date of enactment. Pub. L. No. 108-357, § 417, 118 Stat. 1418, 1512 (2004).

**07-13154 Ford Motor Co v. Willis**

## Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 2, 2007, by electronic and/or ordinary mail.


                                          s/Julie Owens  
                                       Case Manager, (313) 234-5160